UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Crim. No. 18-cr-10326-RWZ |
| v. ) | |
| ) | |
| GARY HERMAN, ) | |
| Defendant. ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through the undersigned Assistant U.S. Attorneys, requests that on June 20, 2019 the Court sentence defendant, Gary Herman (hereinafter, "defendant" or "Herman"), to a three month term of imprisonment, a one year term of supervised release, a fine within the Guideline sentencing range calculated by the parties in their plea agreement (unless the Court finds that the Defendant is not able to pay a fine) and that the Court order the payment of restitution to the MSP.

**Facts**

**A. Introduction**

In early 2017, the Massachusetts State Police ("MSP") began an internal investigation of several overtime programs within what was then known as Troop E.[1] Troop E was primarily responsible for enforcing criminal law and traffic regulations on Interstate-90, the Massachusetts Turnpike ("I-90"), which spans the Massachusetts/New York border to the Boston Harbor. Troop

---

[1] Troop E has since been disbanded and its members and responsibilities absorbed into other MSP troops.

E was comprised of approximately one hundred and fifty troopers, assigned to five barracks: Westfield, Charlton, Weston, Tunnels, and Headquarters.[2]

In early 2018, MSP announced that an internal audit had revealed that a number of former Troopers were suspected of failing to work some or all of the overtime shifts for which they had been paid. Soon after, the United States Department of Transportation and FBI began an investigation of the suspected overtime abuse within Troop E.

As a result of that investigation, seven former Troopers (including this defendant) and one former lieutenant were charged with embezzling funds from an agency receiving federal funding, in violation of 18 U.S.C. §666.

As of this date, all eight have pleaded guilty to the charges.[3] *See* Pre-Sentence Report ("PSR"), ¶6.

---

[2] Both the Tunnels and Headquarters Barracks were located in Boston.

[3] Former Trooper Eric Chin has been sentenced to one day of incarceration, followed by a one year term of supervised release, former Trooper Gregory Raftery was sentenced to three months' incarceration followed by a one year term of supervised release, former Trooper Kevin Sweeney was sentenced to 60 days incarceration, followed by a one year term of supervised release, former Trooper Heath McAuliffe was sentenced to one day of imprisonment, followed by a one year term of supervised release, and, former Lieutenant David Wilson was sentenced to one day of imprisonment, followed by a two year term of supervised release. *See United States v. Chin*, 18-cr-10384-RGS; *United States v. Raftery*, 18-cr-10203-WGY; *United States v. Sweeney*, 18-cr-10286-NMG; *United States v. McAuliffe*, 19-cr-10056-DLC; and *United States v. Wilson*, 18-cr-10290-RGS. The sentencing of former Trooper Daren DeJong was commenced on May 2, 2019, but has been continued without a new date being set. *See United States v. Daren DeJong*, 18-cr-10307-MLW. The sentencing of former Trooper Paul Cesan has not been set. *See United States v. Paul Cesan*, 18-10383-DPW.

### B. The Abuse of Troop E Overtime Programs

In addition to salary for a regular 8-hour work shift, Troopers within Troop E were also able to earn hourly overtime pay equivalent to 1.5 times their regular hourly pay rate for various overtime assignments. Depending upon seniority, Troopers were paid between approximately $60-75 per hour, while Lieutenants could make $100 per hour, or more.

One of these overtime programs was the "AIRE" (Accident and Injury Reduction Effort) program. The objective of the AIRE program was to reduce accidents, crashes, and injuries on I-90 through an enhanced presence of MSP Troopers who targeted vehicles traveling at excessive speeds and exhibiting aggressive driving behaviors.

These AIRE shifts were 4-hours long and organized by letter according to a specific shift: A-AIRE from 7:30 a.m. to 11:30 a.m.; B-AIRE from 11:00 a.m. to 3:00 p.m.; C-AIRE from 3:30 p.m. to 7:30 p.m.; and D-AIRE from 7:00 p.m. to 11:00 p.m. Each shift was ordinarily comprised of one Officer in Charge ("OIC") and from two, up to five, troopers. The OIC was responsible for insuring that the shifts were conducted according to MSP policy and procedures.

The A, B, and C AIRES were conducted across the entire Turnpike. Thus, for A, B, and C AIRES, Troopers from the far-western section of the state could find themselves under the supervision of an OIC in Boston, or vice versa. The D-AIRES, in contrast, were conducted exclusively in the Boston tunnels and surrounding areas.

Another overtime program was the "X-Team" program. X-Team overtime shifts focused on aggressive driving and were eight hours long, coinciding with existing MSP work shifts, *i.e.*, 7:00 a.m. to 3:30 p.m. (day); 3:00 p.m. to 11:30 p.m. (evening); and 11:00 p.m. to 7:30 a.m. (midnight).

Troopers were expected to issue a minimum of eight to ten citations for each AIRE shift and twelve to fifteen citations for each X-Team shift. Any failure to issue the required number of citations drew negative scrutiny from supervisors and command staff.

Investigation has revealed that the subjects of this investigation performing AIRE and X-Team overtime routinely and regularly did not work the full four, or eight, hours required. Troopers assigned to these shifts who chose to abuse these overtime benefits would purport to write the minimum number of tickets, and then simply go home. In many instances, these Troopers would obtain the minimum number of citations in an hour, or less.

In other circumstances, such as inclement weather, these Troopers would forgo writing any citations at all. In the event of such weather, policy required Troopers working these overtime shifts to continue to work, *i.e.*, "re-deploy," as directed by superiors. In practice, inclement weather meant neither tickets, nor work, was required for Troopers who chose to fraudulently abuse the AIRE program. Reminiscent of a grade school "snow day," Troopers abusing the program treated AIRE overtime as if it were a paid holiday.

## **Advisory Sentencing Guidelines**

**A.     The Plea Agreement**

The parties' positions with respect to the Sentencing Guidelines, which are set forth in pages 2-3 of the Plea Agreement, are:

(i)     in accordance with USSG §§ 2B1.1(a)(2), defendant's base offense level is 6, because the offense of conviction has a statutory maximum term of imprisonment that is less than 20 years;

(ii)    in accordance with USSG §§ 2B1.1(b)(1)(B), defendant's offense level is increased by two levels because the offense involved a loss in excess of $6,500 but less than $15,000;

(iii) in accordance with USSG §§ 2B1.1(b)(10), defendant's offense level is increased by two levels because the offense involved sophisticated means;

(iv) in accordance with USSG §§ 3B1.3, defendant's offense level is increased by two levels because the offense involved the abuse of a position of trust;

(v) in accordance with USSG §3E1.1, the U.S. Attorney agrees to recommend that the Court reduce by two levels defendant's adjusted offense level because of defendant's prompt acceptance of personal responsibility for the offense conviction in this case.

Accordingly, the parties have calculated the total offense level to be 10. Mr. Herman's criminal history category is I, which results in a GSR of 6-12 months' imprisonment. *See* Plea Agreement [D. 23], p. 2-3.

**B.  The Pre-Sentence Report**

In the PSR, Probation's analysis mirrors that of the parties, except that Probation has determined that the loss in this matter should be calculated to be $28,049.25. PSR, ¶26A.

In response to a request from Probation, the United States has reviewed calendar year 2015 materials that it had obtained for the purpose of potentially bringing a superseding indictment against Herman. Using those materials, and the same methodology as was utilized to calculate the 2016 loss, the government estimated that Herman was not present, and not working, for 77.75 hours of AIRE overtime, and 130 hours of X-Team overtime, during 2015. At a rate of approximately $75 per hour, the loss to the MSP for 2015 was $15,581.25.

Probation has included those figures in its loss estimate. The inclusion of that loss leads to a further increase of two points to the Guideline calculation, due to a four point increase under USSG §2B1.1(b)(1)(C), because the amount of loss is greater than $15,000, but less than $40,000.

Using those calculations, Probation has determined the total offense level to be 12. That offense level, with criminal history category I, results in a GSR of 10 to 16 months' imprisonment.[4]

### Herman's Offense Conduct

Herman had been a Massachusetts State Trooper for just under twenty years at the time of his suspension in March of 2018. In 2016, Herman collected over $12,000 for AIRE and X-Team overtime shifts and hours that he did not work. To accomplish this fraud, Herman falsified citations, overtime paperwork, and MSP payroll submissions. To generate his bogus citations, Herman copied the information from previously issued citations, sometimes more than once.

Herman's conduct on June 17, 2016, is exemplary of this fraud. On that day, payroll records reflect that Herman was on leave and did not work his regular shift from 11:00 p.m. through 7:30 a.m. Instead, Herman worked a detail from 8:00 a.m. to 2:00 p.m. and a C-AIRE overtime shift from 3:30 p.m. to 7:30 p.m.

To be paid for the C-AIRE overtime shift, Herman submitted eight citations he claimed to have written during the AIRE shift. In contrast to that claim, however, three of those citations were written during time he was being paid to work the detail, *i.e.*, between 12:20 p.m. and 12:55 p.m. The remaining five citations, which Herman claimed to have written between 2:10 p.m. and 3:10 p.m. were wholly bogus. In fact, Herman had written identical citations to those same five

---

[4] The government objects to the PSR's offense level calculation because it is bound by the plea agreement to calculate the guidelines in accordance with section 3 of the plea agreement (at page 2) as set forth above.

individuals months before, on April 22, 2016, and simply re-used the information from those citations to create bogus citations in order to paid for hours he did not work. [5]

Herman's cruiser radio data for that day showed that it had been turned on at approximately 7:02 a.m. (consistent with when he began the detail) and was turned off at 1:51 p.m. (when the detail ended). Herman's cruiser radio was not turned back on until 10:37 p.m. on June 19, 2016. Thus, the entire time that Herman claimed to be working an AIRE shift on June 17, 2016, Herman's cruiser radio was off – signifying that he was not driving or operating his cruiser.

By way of further example, on June 19, 2016, payroll records reflect that Herman worked a B-AIRE shift from 11:00 a.m. to 3:00 p.m. To be paid for that overtime shift, Herman submitted eight citations he claimed to have written during that shift. The citations purported to have been written between 11:18 a.m. and 12:57 p.m.

None of those citations were real. Seven of the citations contained information identical to citations that had been issued months earlier, on April 9, 2016. The eighth citation included information on a driver for whom Herman had run a driver history on April 23, 2016.[6]

Herman's cruiser radio showed that it had last turned off two days earlier, at 1:51 p.m. on June 17, 2016, and did not turn on again until 10:37 p.m. on June 19, 2016. Thus, the entire time

---

[5] The First Circuit has held that the sophisticated means enhancement is appropriately applied in cases involving numerous, even repetitive, steps, regardless of whether each step was itself sophisticated. *United States v. Foley*, 783 F.3d 7, 25 (1st Cir. 2015) (and cases cited). The many steps involved in this scheme, some or all of which were undertaken for each fraudulent overtime shift throughout the year, "make [Herman's] scheme more effective and difficult to thwart, and it is enough to justify the enhancement." *Foley*, 783 F.3d at 25 (quotation omitted).

[6] On June 19, 2016, Herman ran only one driver history check at 11:21 p.m. (approximately twelve hours after the AIRE shift had ended).

that Herman claimed to be working an AIRE shift on June 19, 2016, Herman's cruiser radio was off – signifying that he was not driving or operating his cruiser.

Investigators found a similar pattern of fraud throughout Herman's MSP records for 2016 (*i.e.*, cruiser radio data, CJIS data, bogus citations, MSP paperwork, etc.). Investigators have determined that during that period, Herman was not present for approximately 84.75 hours of AIRE overtime and 81.5 hours of X-team overtime.[7] At a rate of approximately $75 per hour, the MSP paid Herman $12,468 for overtime hours that were not worked.

## Argument

Few crimes strike at the core of the justice system more than those involving law enforcement officers who choose to break, rather than uphold, the law. Though at its heart a crime motivated by simple greed, it is far more troubling than the run of the mill fraud cases in this court. This crime, and the abusive culture it served to perpetuate, reflect a betrayal of the trust and power granted to those who serve in law enforcement.

The factors set forth in 18 U.S.C. §3553(a), including: the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the conduct; dictate a sentence of three months incarceration, a one year term of supervised release, a fine within the Guideline sentencing range calculated by the parties in their plea agreement (unless the Court finds that the Defendant is not able to pay a fine) and the payment of restitution to the MSP.

---

[7]  In or around 2016, Herman's annual MSP compensation was approximately $227,826, which included approximately $63,053 in overtime pay.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: */s/ Mark Grady*
MARK GRADY
DUSTIN CHAO
Assistant U.S. Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Mark Grady*
MARK GRADY
DUSTIN CHAO
Assistant U.S. Attorneys

Date: June 14, 2019